UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| SALMON SPAWNING AND RECOVERY ALLIANCE, et al., | |
| Plaintiffs, | No. C05-1878Z |
| v. | ORDER |
| DEBORAH J. SPERO, in her official capacity, et al., | |
| Defendants. | |

This matter comes before the Court on Defendants' Motion to Dismiss Plaintiffs' Complaint for Declaratory and Injunctive Relief, docket no. 8. Having considered the briefs in support of, and in opposition to, the motion, the Court now GRANTS IN PART and DENIES IN PART the motion to dismiss, as outlined herein.

## BACKGROUND

### A.    Present Lawsuit

Salmon Spawning & Recovery Alliance, Native Fish Society, and Clark-Skamania Flyfishers (collectively the "Plaintiffs") have sued Deborah J. Spero, the United States Customs and Border Protection ("CBP"), Gale A. Norton, the United States Department of the Interior, H. Dale Hall, the United States Fish and Wildlife Service ("FWS"), Carlos M. Gutierrez, the United States Department of Commerce, D. Robert Lohn, and the National

ORDER 1–

Marine Fisheries Service ("NMFS") (collectively the "Defendants").  Plaintiffs allege that Defendants have violated Section 9 of the Endangered Species Act ("ESA") by allowing the import of threatened and endangered salmon and steelhead[1] into the United States from Canada.  Plaintiffs also allege that Defendants have violated Section 7 of the ESA by jeopardizing the continued existence of ESA-listed salmon and by not consulting with NMFS regarding the impact of allowing the import of ESA-listed salmon.  Plaintiffs have alleged that the Defendants' actions are "arbitrary and capricious and not in accordance with law," under the standards set forth in the Administrative Procedure Act ("APA").

**B.    Endangered and Threatened Salmon**

Twenty-six populations (referred to under the ESA as "evolutionary significant units" or "distinct population segments") of salmon and steelhead are listed as threatened or endangered under the ESA.  70 Fed. Reg. 37,160 (June 28, 2005); 71 Fed. Reg. 834 (Jan. 5, 2006).  On the Columbia River system, the ESA-listed populations include Chinook salmon from the upper basin (Snake River spring and fall runs, Upper Columbia spring run) and from the lower basin (Upper Willamette, Lower Columbia River).  Compl. ¶ 17.[2]  In Puget Sound, Chinook salmon are listed as threatened.  Id.  Chinook salmon that are born in the Columbia River and Puget Sound drainages, once they mature and travel to the ocean, migrate north to Canadian and Alaskan waters.  Id. ¶ 18.  Their return migration takes the adult salmon through Canadian waters on their way back to the Columbia River and Puget Sound.  Id.

---

[1] For ease of reference, this Order hereinafter refers to ESA-listed "salmon" even though the lawsuit concerns both salmon and steelhead populations.

[2] For the purposes of the motion to dismiss, the Court takes the Plaintiffs' alleged facts in the Complaint as true.

ORDER  2–

**C.     Canadian Fisheries**

Returning ESA-listed Chinook salmon are caught (as bycatch) in substantial numbers in commercial and recreational fisheries conducted off the west coast of Canada, including fisheries in the Georgia Strait and off the west coast of Vancouver Island.  Id. ¶ 19. Canadian fisheries catch a significant portion – on the order of 25 percent or more – of the ESA-listed Chinook salmon caught in all fisheries.  Id. ¶ 20.  NMFS has recently issued biological opinions expressing the agency's concern about the high rates of catch by Canadian and United States fisheries of several ESA-listed Chinook salmon populations.  Id. ¶ 21.

**D.     Pacific Salmon Treaty**

The Pacific Salmon Treaty between the United States and Canada sets management objectives for fisheries off of Southeast Alaska, Canada, Washington, and Oregon.  Id. ¶ 30. A portion of the treaty sets rules for determining the catch of (non-endangered) Chinook salmon allowed in the U.S. and Canadian fisheries.  Id.  In 1999, the U.S. State Department consulted with NMFS before agreeing to the Pacific Salmon Treaty.  Id. ¶ 31.  The Biological Opinion produced by NMFS as a result of that consultation contains no discussion of the impact of U.S. imports of salmon caught in Canada on ESA-listed salmon.  Id.  NMFS issued an incidental take permit, which authorizes the "take" of ESA-listed salmon in the Canadian fisheries, but it does not authorize the import of ESA-listed salmon into the United States, id. ¶ 32, nor could it have so authorized.[3]

---

[3] Section 10 of the ESA allows NMFS or FWS, as appropriate, to waive Section 9(a)(1)(B), which otherwise prohibits the "take" of a listed species, when the take "is incidental to, and not the purpose of, carrying out an otherwise lawful activity."  16 U.S.C. § 1539(a)(1)(B). NMFS may waive Section 9(a)(1)(B) by issuing a Section 10 incidental take permit.  Section 10 does not authorize NMFS to waive the other prohibitions of Section 9, such as Section 9(a)(1)(A)'s prohibition on the import of ESA-listed species into the United States.

ORDER  3–

### E. Importation of ESA-Listed Salmon

ESA-listed salmon that are caught in Canadian commercial fisheries are imported into the United States and sold in interstate commerce. Id. ¶ 24. ESA-listed salmon that are caught in Canadian recreational fisheries are brought back into the United States by U.S. tourists. Id. ¶ 25.

The United States CBP is charged by law with enforcing legal restrictions on the import and export of goods, including those applicable to the import of ESA-listed salmon. Id. ¶ 33; 19 C.F.R. § 12.26. The CBP has adopted regulations applicable to the imports of salmon. Compl. ¶ 33. The Department of the Interior, acting through FWS, is charged by law with enforcing legal restrictions on the international trade in endangered species. Id. ¶ 34. FWS has adopted regulations applicable to the imports of salmon. Id. Neither CBP nor FWS is enforcing the ESA's prohibition on the import of ESA-listed salmon caught in Canada. Id. ¶ 35. Neither CBP nor FWS has consulted with NMFS regarding the agencies' practice of allowing the import into the United States of ESA-listed salmon caught in Canada. Id. ¶ 36.

### F. Present Motion

Defendants move to dismiss the Complaint under FED. R. CIV. P. 12(b)(1), for lack of subject matter jurisdiction, on two independent grounds. First, Defendants argue that this Court lacks jurisdiction over the Complaint because the United States Court of International Trade ("CIT") exercises exclusive jurisdiction over claims arising under laws providing for embargoes or other quantitative restrictions on the importation of merchandise, namely Plaintiffs' Section 9 "import" claim. Defendants also argue that the CIT has supplemental jurisdiction over Plaintiffs' Section 7 "consultation" claim. Second, and in the alternative, Defendants argue that the Court lacks jurisdiction because the federal agencies' alleged failures to enforce the ESA are immune from judicial review. Defendants alternatively move

ORDER  4–

to dismiss the Complaint under FED. R. CIV. P. 12(b)(6), for failure to state a claim upon which relief can be granted.

**G.   Summary of the Court's Order**

The Court GRANTS IN PART and DENIES IN PART Defendants' motion to dismiss, docket no. 8. The Court believes the CIT may have exclusive jurisdiction over Plaintiffs' Section 9 claim. As will be discussed below, the Court declines to dismiss Plaintiffs' Complaint; rather, the Court transfers Plaintiff's Complaint to the CIT so that the CIT may determine its own jurisdiction. As a result of this ruling, the Court does not decide Defendants' alternative grounds for dismissal.[4]

# DISCUSSION
**A.   Standard of Review**

On a motion to dismiss under FED. R. CIV. P. 12(b)(1), even though a defendant moves to dismiss the complaint, the plaintiff bears the burden of proving that the Court has jurisdiction to decide the case. Kokkonen v. Guardian Life Ins. Co., 511 U.S. 375, 377 (1994) ("Federal courts are courts of limited jurisdiction. . . . It is to be presumed that a cause lies outside this limited jurisdiction, and the burden of establishing the contrary rests upon the party asserting jurisdiction.") (citations omitted). In resolving a motion to dismiss for lack of subject matter jurisdiction, the Court is not limited to allegations in the complaint, but may consider material outside the pleadings. St. Clair v. City of Chico, 880 F.2d 199, 201 (9th Cir. 1989) ("Unlike a Rule 12(b)(6) motion, a Rule 12(b)(1) motion can attack the substance of a complaint's jurisdictional allegations despite their formal sufficiency, and in so doing rely on affidavits or any other evidence properly before the court.").

---

[4] The Court notes, however, that if the CIT transfers the case back to the Court, the Court will be inclined to dismiss Plaintiffs' Complaint on the alternative grounds presented by Defendants in their motion to dismiss.

ORDER  5–

**B.     The Endangered Species Act**

     **1.     Overview of the ESA**

The ESA was enacted "to provide a means whereby the ecosystems upon which endangered species and threatened species depend may be conserved, [and] to provide a program for the conservation of such endangered species and threatened species." 16 U.S.C. § 1531(b). An endangered species is one that is "in danger of extinction throughout all or a significant portion of its range," 16 U.S.C. § 1532(6), and a threatened species is one that is "likely to become an endangered species within the foreseeable future throughout all or a significant portion of its range." 16 U.S.C. § 1532(20). The ESA delegates responsibility to determine whether a species should be listed as endangered or threatened to the Secretaries of the Interior and Commerce. 16 U.S.C. §§ 1533(a), 1532(15). The Secretary of the Interior administers the ESA through FWS, and the Secretary of Commerce administers the ESA through NMFS. See 50 C.F.R. § 402.01(b). NMFS has jurisdiction over the ESA-listed salmon populations at issue in this case. See id.

     **2.     ESA Section 7(a)(2)'s Consultation Requirement**

ESA Section 7(a)(2), in pertinent part, requires federal agencies to consult with NMFS to "insure that any action authorized, funded, or carried out by such agency" (referred to as an "agency action") "is not likely to jeopardize the continued existence of any endangered species or threatened species" of salmon. 16 U.S.C. § 1536(a)(2). "[T]he obligation of each agency to 'insure' that its covered actions are not likely to jeopardize listed species is an obligation in addition to those created by the agencies' own governing statute." Defenders of Wildlife v. Envtl. Prot. Agency, 420 F.3d 946, 967 (9th Cir. 2005); see also Tennessee Valley Auth. v. Hill, 437 U.S. 173, 173 (1973) (Section 7 is an "affirmative[] command"). If an agency determines that a particular action will have no effect on a listed species, Section 7(a)(2)'s consultation requirement is not triggered. 50 C.F.R. §§ 402.12, 402.14(b); Southwest Ctr. for Biological Diversity v. United States Forest Serv., 100 F.3d 1443, 1447-

ORDER  6–

48 (9th Cir. 1996). If an agency determines that "any action may affect listed species," then it must pursue either "informal consultation" or "formal consultation" with NMFS, as appropriate. 50 C.F.R. §§ 402.13, 402.14(a).

"Informal consultation is an optional process that includes all discussions, [and] correspondence" between the "action agency" and NMFS, and is "designed to assist the [action agency] in determining whether formal consultation . . . is required." 50 C.F.R. § 402.13(a). No formal consultation is required if the action agency, as a result of informal consultation, "determines, with the written concurrence of [NMFS], that the proposed action is not likely to adversely affect any listed species . . . ." 50 C.F.R. § 402.14(b)(1). Conversely, formal consultation is required if the proposed action is "likely to adversely affect any listed species." See 50 C.F.R. §§ 402.13, 402.14(a)-(b).

Formal consultation begins when the action agency makes a written request for consultation and ends when NMFS issues a biological opinion. 16 U.S.C. § 1536(b)(3); 50 C.F.R. §§ 402.14(c), (g). The biological opinion assesses "whether the action . . . is likely to jeopardize the continued existence of listed species . . . ." 50 C.F.R. § 402.14(g)(4). If "jeopardy" is likely, NMFS must determine whether any "reasonable and prudent alternatives" exist for the action to avoid jeopardizing the continued existence of the species in violation of Section 7(a)(2). 16 U.S.C. § 1536(b)(3)(A); 50 C.F.R. § 402.14(h)(3). If the action is not likely to jeopardize the species, but will result in the incidental "take" of members of the species, then NMFS will provide an incidental take statement, along with the biological opinion, that imposes measures to minimize the impact of the take and exempts the agency from liability for prohibited take under ESA Section 9(a)(1)(B). 16 U.S.C. §§ 1536(b)(4), (o)(2).

### 3. ESA Section 9's Prohibitions

Section 9(a)(1)(A) of the ESA, and its implementing regulations, prohibit the import of ESA-listed salmon into the United States. 16 U.S.C. § 1538 (a)(1)(A) (prohibiting the

ORDER 7–

import of endangered species); 50 C.F.R. § 223.203(a) (applying Section 9(a)(1)'s prohibitions to threatened salmon).  Section 9(a)(1), in its entirety, provides that it is unlawful for any person subject to the jurisdiction of the United States to:

> (A) import any such species into, or export any such species from the United States;
> (B) take any such species within the United States or the territorial sea of the United States;
> (C) take any such species upon the high seas;
> (D) possess, sell, deliver, carry, transport, or ship, by any means whatsoever, any such species taken in violation of subparagraphs (B) and (C);
> (E) deliver, receive, carry, transport, or ship in interstate or foreign commerce, by any means whatsoever and in the course of a commercial activity, any such species;
> (F) sell or offer for sale in interstate or foreign commerce any such species; or
> (G) violate any regulation pertaining to such species or to any threatened species of fish or wildlife listed pursuant to section 1533 of this title and promulgated by the Secretary pursuant to authority provided by this chapter.

16 U.S.C. § 1538(a)(1).

### 4. ESA Section 11's Enforcement Scheme

ESA Section 11 sets forth the enforcement scheme for the ESA, establishing the penalty scheme for both civil and criminal violations.  16 U.S.C. §§ 1540(a), (b).  Congress directed that the provisions of the ESA "shall be enforced by the Secretary [i.e., Secretary of Commerce or Interior], the Secretary of the Treasury, or the Secretary of the Department in which the Coast Guard is operating. . . ."  16 U.S.C. § 1540(e).  The statutory reference to the Secretary of the Treasury now refers to the function of the CBP, under the Secretary of Homeland Security.  6 U.S.C. § 552(d).

In addition to governmental enforcement, Congress also permitted "any person" to commence a civil suit "to enjoin any person, including the United States and any other governmental instrumentality or agency . . . who is alleged to be in violation of any provision of this chapter or regulation issued under the authority thereof."  16 U.S.C. § 1540(g)(1)(A).

ORDER 8−

**C.      Administrative Procedure Act**

"The APA's comprehensive provisions for judicial review of 'agency actions,' are contained in 5 U.S.C. §§ 701-706." <u>Heckler v. Chaney</u>, 470 U.S. 821, 828 (1985). "Any person 'adversely affected or aggrieved' by agency action, <u>see</u> § 702, including a 'failure to act,' is entitled to 'judicial review thereof,' as long as the action is a 'final agency action for which there is no other adequate remedy in a court,' <u>see</u> § 704." <u>Id.</u> "The standards to be applied on review are governed by the provisions of § 706." <u>Id.</u> However, a party is not entitled to judicial review "to the extent that – (1) statutes preclude judicial review; or (2) agency action is committed to agency discretion by law." 5 U.S.C. § 701(a).

**D.      Analysis**

      **1.      Exclusive Jurisdiction of the Court of International Trade**

The CIT is a court established under Article III of the U.S. Constitution, 28 U.S.C. § 251(a),[5] and possesses "all the powers in law and equity of, or as conferred by statute upon, a district court of the United States." 28 U.S.C. § 1585. The CIT may order "any . . . form of relief that is appropriate in a civil action, including, but not limited to, declaratory judgments, orders of remand, injunctions, and writs of mandamus and prohibition." 28 U.S.C. § 2643(c)(1). Accordingly, the CIT is authorized to grant Plaintiffs the declaratory and injunctive relief that they seek in the present case.

The CIT's exclusive jurisdiction is provided, in pertinent part:

---

[5] "The President shall appoint, by and with the advice and consent of the Senate, nine judges who shall constitute a court of record to be known as the United States Court of International Trade. Not more than five of such judges shall be from the same political party. The court is a court established under article III of the Constitution of the United States." 28 U.S.C. § 251(a).

ORDER  9–

> [T]he Court of International Trade shall have exclusive jurisdiction of any civil action commenced against the United States, its agencies, or its officers, that arises out of any law of the United States providing for . . . (3) embargoes or other quantitative restrictions on the importation of merchandise for reasons other than the protection of public health or safety.

28 U.S.C. § 1581(i)(3) ("Section 1581(i)(3)").

Defendants argue that Section 9(a)(1)(A)'s prohibition on the import of ESA-listed salmon into the United States falls within the exclusive jurisdiction of the CIT because it constitutes an "embargo[] or other quantitative restriction[] on the importation of merchandise for reasons other than the protection of public health or safety" under Section 1581(i)(3).  The Supreme Court has defined "embargo" to mean a "government order prohibiting commercial trade with individuals or businesses of other nations."  Kmart Corp. v. Cartier, Inc., 485 U.S. 176, 184 (1988) (quoting Black's Law Dictionary 468 (5th ed. 1979)).  In addition, an embargo is "a policy which prevents goods from entering a nation" and which "may be imposed on a product or on an individual country."  Id. (quoting J. Berenyi, The Modern American Business Dictionary 103 (1982)).  The Supreme Court relied upon these dictionary definitions to conclude that "the ordinary meaning of 'embargo,' and the meaning that Congress apparently adopted in the statutory language 'embargoes or other quantitative restrictions,' is a governmentally imposed quantitative restriction – of zero – on the importation of merchandise."  Id. at 185.

The Supreme Court in Kmart also clarified the purposes behind governmental embargoes, noting that "[t]rade policy is not the sole, nor perhaps even the primary, purpose served by embargoes."  Id. at 184.  For example, a governmental embargo may be imposed "to further interests relating to . . . ecology," such as the embargo on fur seal or sea otter skins set forth in 19 C.F.R. § 12.60 (1987).  Id.  Applying Kmart's definition of embargo, the Ninth Circuit has twice held that the CIT has exclusive jurisdiction over cases involving embargoes imposed for environmental protection purposes.  See Earth Island Inst. v. Brown, 28 F.3d 76, 78 (9th Cir. 1994) (involving prohibitions on the importation of "commercial fish

ORDER  10–

or products from fish," including yellowfin tuna, to protect marine mammals); Earth Island Inst. v. Christopher, 6 F.3d 648, 651-52 (9th Cir. 1993) (involving prohibitions on the "importation of shrimp or products from shrimp" to protect sea turtles).

In Kmart, the issue was whether the prohibition on the import of certain "gray-market" goods under Section 526(a) of the Tariff Act of 1930 constituted an embargo under Section 1581(i)(3). "A 'gray market' good is a foreign-manufactured good that bears a valid United States trademark, which is imported without the consent of the United States trademark owner." Kmart, 485 U.S. at 179. The Supreme Court held that the prohibition on the import of "gray market" goods was not an embargo under Section 1581(i)(3) because it did not "reflect[] a *governmental* restriction on the quantity of a particular product that will enter," but rather "provide[d] a mechanism by which a private party might, at its own option, enlist the Government's aid in restricting the quantity of imports in order to enforce a private right." Id. at 185 (emphasis in original). The Supreme Court reasoned that "[t]he trademark owner has sole authority to decide that all products bearing its trademark will enter or that none will, and to decide what entity may import them, under what conditions, and for what purpose." Id. at 186.

In the present case, it is undisputed that Section 9(a)(1)(A)'s prohibition on the import of ESA-listed salmon is a *governmental* restriction. Instead of challenging the governmental nature of the prohibition on the import of ESA-listed salmon, Plaintiffs argue that the CIT does not have exclusive jurisdiction pursuant to Section 1581(i)(3) because: (1) ESA-listed salmon are not "merchandise," and (2) Section 9(a)(1)(A)'s prohibition on the import of ESA-listed salmon is not a quantitative restriction of zero on salmon imports.[6]

---

[6] The Court finds a third argument made by Plaintiffs in a footnote unpersuasive. Pls.' Opp'n, docket no. 10, at 8 n.5. Plaintiffs attempt to characterize the prohibition on the import of ESA-listed salmon as an embargo for "the protection of public health and safety," and thus not within CIT's exclusive jurisdiction. While it is true that the interests of public health and safety may be furthered by the ESA, the enumerated purposes of the ESA seem to fall within Kmart's "to further interests relating to ecology" purpose of an embargo. Kmart,

ORDER  11–

### a. Are ESA-listed Salmon "Merchandise"?

Neither the statute providing for the CIT's exclusive jurisdiction nor the case law defines "merchandise," as the term is used in Section 1581(i)(3). Plaintiffs argue that "merchandise" should be defined, as embargo was in Kmart, by its "ordinary meaning," and they rely on the same dictionary sources used in Kmart. 485 U.S. at 184-85; see also United States v. Commodities Export Co., 14 C.I.T. 166, 169-70, 733 F. Supp. 109 (Ct. Int'l Trade 1990) (using Black's Law Dictionary to define "importation"). Black's Law Dictionary defines merchandise as:

> All goods which merchants usually buy and sell, whether at wholesale or retail; wares and commodities such as are ordinarily the objects of trade and commerce. But the term is generally not understood as including real estate, and is rarely applied to provisions such as are purchased day by day for immediate consumption (e.g. food).[7]

Black's Law Dictionary 986-87 (6th Ed. 1990). Merchandise is "[f]inished goods bought by a retailer and held in inventory for resale." J. Berenyi, The Modern American Business Dictionary 172 (1982).

The Court believes that ESA-listed salmon may fall within the "ordinary meaning" of "merchandise," as provided by the dictionary definitions, because merchants buy and sell ESA-listed salmon as objects of trade and commerce. Plaintiffs allege in their Complaint that the ESA-listed salmon caught by commercial fishermen[8] in Canada make their way into

---

485 U.S. at 184; see 16 U.S.C. § 1531(b) (ESA's purposes speak of "ecosystems," "species" and "conservation," not public health and safety).

[7] Neither party discusses the reference to "food" in the definition of merchandise in Black's Law Dictionary. Brown and Christopher, which involved tuna and shrimp imports, respectively, demonstrate that food can be considered "merchandise," as the term is used in Section 1581(i)(3).

[8] Plaintiffs argue that salmon brought back into the United States from Canada by recreational fishermen should not be considered "merchandise" because the recreational fishermen import the salmon for personal use, not for sale. See Imperial Packaging Corp. v. United States, 2 C.I.T. 250, 252-53, 535 F. Supp. 688 (Ct. Int'l Trade 1981) (defining the

ORDER  12–

the stream of interstate commerce in the United States. Compl. ¶ 24 ("... salmon listed as 'threatened' under the ESA, are ... sold in interstate commerce.").

Plaintiffs argue that since it is illegal for commercial fishermen to introduce ESA-listed salmon into commerce,[9] ESA-listed salmon should not be considered "merchandise" when they are imported. Defendants respond that none of the cited dictionary definitions address the legality of the commercial transactions in goods. Defendants point out that U.S. customs laws, specifically the Tariff Act of 1930, define "merchandise" as "goods, wares, and chattels of every description, and *includes merchandise the importation of which is prohibited* . . . ." 19 U.S.C. § 1401(c) (emphasis added). This definition, however, does not address the legality of the *commerce* in the goods, and adds nothing that the Court didn't already know from Brown and Christopher, which both involved products (i.e., tuna and shrimp) the importation of which was prohibited. Neither Brown nor Christopher addresses the legality of the *commerce* in the banned item.

The Supreme Court's fur seal example of an embargo to further "ecology" interests provides some guidance on the legality of commerce issue. See Kmart, 485 U.S. at 184. The fur seal example involved a prohibition not only on the "importation" of fur seal and sea otter skins, but also a prohibition on the "sale" of such skins. 19 C.F.R. § 12.60 (1987) ("The

---

term "merchandise," as the term is used in other statutes, to mean "products which are still in the 'stream of commerce,' rather than articles which are personal effects or commodities in the hands of the ultimate consumer."). Even if the Court were to apply Imperial Packaging's definition of merchandise, which was not interpreting Section 1581(i)(3), to the present case, the CIT may exercise supplemental jurisdiction over Plaintiffs' Section 9 claim regarding the import of ESA-listed salmon caught in recreational fisheries. This claim arises out of the same facts as Plaintiffs' Section 9 claim regarding the import of ESA-listed salmon caught in commercial fisheries.

[9] See 16 U.S.C. § 1538(a)(1)(E) (making it unlawful for a person to "deliver, receive, carry, transport, or ship in interstate or foreign commerce, by any means whatsoever and in the course of a commercial activity, any [listed] species"); 16 U.S.C. § 1538(a)(1)(F) (making it unlawful for a person to "sell or offer for sale in interstate or foreign commerce any listed species").

ORDER  13–

transportation, importation, sale, or possession of the skins of fur seals or sea otters is prohibited if such skins were taken contrary to the provisions of section 2 of the act of February 26, 1944 (58 Stat. 100-104) or, the case of such skins taken under the authority of the act or any fur-seal agreement, if the skins are not officially marked and certified as required by section 2 of the act. . . ."). This example is analogous to the present case, in which the ESA prohibits both the import and the sale of ESA-listed salmon. Plaintiffs attempt to distinguish this example by noting that the Code of Federal Regulations specifically referred to the fur seal and sea otter skins as "Special Classes of *Merchandise*." 19 C.F.R. § 12.60 (emphasis added). Even though an express categorization of ESA-listed salmon as "merchandise" is absent in the present case, the fur seal example demonstrates that an item can be "merchandise" even though its sale is prohibited by law.

Clearly, there is some ambiguity here because neither the statute setting forth the CIT's exclusive jurisdiction nor the case law defines "merchandise," and the dictionary definitions do not address whether the legality of the commerce is a material issue. In the Ninth Circuit, "[c]onflicts between the broad grants of jurisdiction to the district courts and the grant of exclusive jurisdiction to the [CIT, formerly the Customs Court] are to be resolved by upholding the exclusivity of the [CIT] jurisdiction." Cornet Stores v. Morton, 632 F.2d 96, 98 (9th Cir. 1980) (quoting Fritz v. United States, 535 F.2d 1192, 1194 (9th Cir. 1976)); see Christopher, 6 F.3d at 652 (applying Cornet to uphold the exclusivity of the CIT's jurisdiction). In resolving any ambiguities in favor of upholding the CIT's jurisdiction, the Court concludes that ESA-listed salmon may constitute "merchandise," as the term is used in Section 1581(i)(3). This issue will ultimately be decided by the CIT.

    **b.**    **Does Section 9(a)(1)(A)'s Prohibition on the Import of ESA-listed Salmon Constitute a "Quantitative Restriction of Zero"?**

As previously mentioned, the Supreme Court in Kmart defined Section 1581(i)(3)'s "embargoes or other quantitative restrictions," as "a governmentally imposed quantitative

ORDER  14–

restriction – of zero – on the importation of merchandise." 485 U.S. at 185. Plaintiffs argue that the ESA's prohibition on the import of ESA-listed salmon is a qualitative, not a quantitative, restriction on salmon imports. Plaintiffs argue that, in contrast to the flat prohibition on *all* tuna and shrimp imports in Brown and Christopher, respectively, the ESA does not prohibit all salmon imports, just salmon that are endangered or threatened.

In Kmart, the Supreme Court cautioned against converting licensing and tagging requirements on dairy, and inspection requirements on meat, into embargoes. See 485 U.S. at 187. Plaintiffs attempt to analogize Section 9(a)(1)(A)'s prohibition on the import of ESA-listed salmon to the prohibition on the import of uninspected, untagged or uninspected dairy and meat products held not to be an embargo in Kmart. In an attempt to make the ESA's prohibition on the import of ESA-listed salmon sound more like an inspection requirement than an outright ban, Plaintiffs discuss how wild salmon with an intact adipose fin could be distinguished from hatchery-origin salmon with a clipped adipose fin. This discussion does not seem relevant and does not alter the fact that the ESA bans the import of all ESA-listed salmon.

The Ninth Circuit has twice rejected attempts to extend the circumstances under which Kmart's licensing, tagging and inspection scenario would apply. See Brown, 28 F.3d at 78; Christopher, 6 F.3d at 652. The argument in the present case seems even weaker than in Brown and Christopher because in those cases, the tuna or shrimp could be imported if the exporting nations could meet certain conditions prior to importation. In contrast, the ESA prohibits the import of ESA-listed salmon under any circumstances from any nation. There is no licensing, tagging, inspection or certification conditions that could be met to waive the ESA's prohibition on the import of ESA-listed salmon. Accordingly, the Court concludes that Section 9(a)(1)(A)'s prohibition on the import of ESA-listed salmon may constitute a "quantitative restriction of zero" on all ESA-listed salmon. Again, this issue will ultimately be decided by the CIT.

ORDER  15–

### c. **Does the CIT have Supplemental Jurisdiction over Plaintiffs' Section 7 Claim?**

Defendants argue that the CIT may exercise supplemental jurisdiction over Plaintiffs' Section 7 "consultation" claim if the CIT has exclusive jurisdiction over Plaintiffs' Section 9 "import" claim. Because 28 U.S.C. § 1585 grants the same powers to the CIT as to district courts, the CIT has supplemental jurisdiction pursuant to 28 U.S.C. § 1367(a) to hear other related claims, "but only if appended to claims properly before the court under the customs and trade laws." Associacao Dos Industriais de Cordoaria E Redes v. United States, 17 C.I.T. 754, 763 n.16, 828 F. Supp. 978 (Ct. Int'l Trade 1993); see also B-West Imports, Inc. v. United States, 19 C.I.T. 303, 315 n.15, 880 F. Supp. 853 (Ct. Int'l Trade 1995), aff'd 75 F.3d 633 (Fed. Cir. 1996) (exercising supplemental jurisdiction over takings claim, noting relatedness of the takings claim to the import embargo claim and the "intertwining of issues"). Plaintiffs correctly point out that the CIT's exercise of supplemental jurisdiction is purely discretionary. That, however, is not a reason for the Court to keep Plaintiffs' Section 7 claim when their Section 7 and 9 claims appear related. If the CIT declines to exercise supplemental jurisdiction, then Plaintiffs' Section 7 claim may be transferred back to this Court. Accordingly, the Court transfers Plaintiffs' Section 7 "consultation" claim in addition to Plaintiffs' Section 9 "import" claim.

### d. **Should the Court Transfer or Dismiss the Complaint?**

Plaintiffs argue that transfer, not dismissal, is the proper remedy if the Court determines that the CIT may have exclusive jurisdiction over Plaintiffs' claims. If a "court finds that there is a want of jurisdiction, the court shall, if it is in the interest of justice, transfer such action . . . to any other such court in which the action . . . could have been brought at the time it was filed . . . , and the action . . . shall proceed as if it had been filed in . . . the court to which it is transferred on the date upon which it was actually filed in . . . the court from which it is transferred." 28 U.S.C. § 1631; see also Pentax Corp. v. Myhra, 72

ORDER  16–

F.3d 708, 711 (9th Cir. 1995) (directing the district court to transfer the case to the CIT so that the CIT can determine the question of its own jurisdiction). Transfer is the appropriate remedy in the present case.

## CONCLUSION

The Court GRANTS IN PART and DENIES IN PART Defendants' Motion to Dismiss Plaintiffs' Complaint for Declaratory and Injunctive Relief, docket no. 8. The Court TRANSFERS Plaintiffs' Complaint to the CIT so that the CIT may determine the question of its own jurisdiction.

IT IS SO ORDERED.

DATED this 3rd day of May, 2006.

_____
Thomas S. Zilly
United States District Judge

ORDER  17–